IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

JANE ROE,

               Plaintiff,

v.                                   CIVIL ACTION NO.   3:22-0532

MARSHALL UNIVERSITY
BOARD OF GOVERNORS,

               Defendant.

### MEMORANDUM OPINION & ORDER

Before the Court is Defendant Marshall University Board of Governors' Motion for Summary Judgment. *See* ECF No. 165. After review, the Court **GRANTS** Defendant's Motion.[1]

### BACKGROUND

### I

On September 3, 2022, Marshall University hosted a daytime football game. *See* Def.'s Mem., Ex. F at 5 (Hearing Packet), ECF No. 171-4. Jane Roe attended. *See id.*, Ex. A at 23:6–11, ECF No. 171 (Jane Roe Dep.). During the game, Roe encountered her ex-boyfriend John Doe. *See id.* They hugged. *See id.* at 23:13–14. Soon after they parted, Roe left the game. *See id.* at 27:1–4.

Around 5:30 pm, Roe attended a party at 359 Marion Court in Huntington, West Virginia. *See id.* at 31:1–2; 34:3–16. Around fifteen people attended. *See id.* at 42:11–15. By the time Roe arrived, the "game was already over." *Id.* at 34:14–15.

---

[1] The Court also considered Defendant's Memorandum of Law in Support of its Motion for Summary Judgment ("Def.'s Mem."), ECF No. 166; Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Resp."), ECF No. 180; and Defendant's Reply in Support of its Motion for Summary Judgment ("Def.'s Reply"), ECF No. 190.

Neither Marshall University nor its student organizations owned, controlled, or leased 359 Marion Court. *See id.*, Ex. C ¶¶ 5–6, 8–10, ECF No. 165-3. Similarly, Marshall University did not host, sanction, sponsor, or affiliate itself with the party. *See id.* ¶¶ 12–13. No student, faculty member, or other member of Marshall University's community sought permission to host the party. *See id.* ¶ 13. Marshall University was not aware of the party before it occurred. *See id.* ¶ 15.

At the party, Roe took a "couple shots" of alcohol. *Id.* at 42:20–22. She ran into Doe. *See id.* at 41:12–15. He was "blackout drunk." Hearing Packet at 5. At some point, the two students sought privacy in a bathroom. *See* Jane Roe Dep. at 51:8. There, Doe got "really aggressive." *Id.* at 51:9. He pushed Roe into a wall, put his hands on her throat, and attempted to pull her pants down. *See* Hearing Packet at 5. Roe escaped outside. *See id.* Doe followed. *See id.* He attempted to kiss her. *See id.* When she refused, Doe bit the outside of her mouth "drawing blood." *Id.* Disturbed, Roe called her brother. *See id.* Someone called 911. *See id.*

When officers arrived, they found Doe on the front porch of the residence. *See* Def.'s Mem., Ex. B at 2, ECF No. 171-1. They arrested him and charged him with domestic battery. *See id.* They then reported the incident to Marshall University's Title IX office. *See* Def.'s Mem., Ex. D at 27:14–21, ECF No. 171-2 (Lisa Martin Dep.); Hearing Packet at 3.[2]

## II

## A

On September 7th, Marshall University's Title IX Evaluation Committee reviewed the Huntington Police Department's report, *see* Lisa Martin Dep. at 27:9–28:3, to decide whether

---

[2] At the time, Marshall University and the Huntington Police Department did not have a "formal or informal agreement" to share information about "potential law enforcement actions involving Marshall University students." Def.'s Mem., Ex. N. ¶¶ 3, 5, ECF No. 165-14. Instead, the Huntington Police Department shared information as a "general sharing of information between police forces"—a "common" practice among law enforcement agencies. *Id.* ¶ 4. *See also* Pl.'s Resp., Ex. K at 8:15–21, ECF No. 186-8 (similar).

Marshall University's Title IX office or Office of Student Conduct should handle the university's response to the incident, *see id.*, Ex. E at 122:1–20, ECF No. 171-3 (Debra Hart Dep.).

The Committee looked to Marshall University Board of Governors Policy No. GA-1. *See id.*, Ex. H, ECF No. 165-8. Policy No. GA-1 states: Marshall University will address sexual harassment in its "programs and activities." *Id.* at 4. These include "locations, events[,] or circumstances over which the University exercises substantial control over both the Respondent and the Complainant and the context in which the alleged sexual harassment occurs." *Id.* Although "[o]ff-campus conduct at private residences, businesses, events, or other locations" are areas of concern, if the alleged conduct did not occur in an education program or activity, the Title IX office "must dismiss the formal complaint . . . for purposes of sexual harassment under Title IX." *Id.* Such dismissal, however, does not "preclude action under another provision of the University's policies or procedures"—including its Student Code of Rights & Responsibilities. *Id.*

Typically, the Committee would analyze a "number of things" when determining Title IX jurisdiction. Debra Hart Dep. at 123:7. For example, it would ask whether the underlying incident occurred on campus or off campus, whether the party was a sanctioned university activity or outing, and whether students advertised the party on HerdLink—a portal used by student organizations to advertise their events. *See id.* at 49:14–16; 51:22–52:11. It would also look to see if Marshall University provided any financial or other support to the event. *See id.* at 123:1–8 (looking for university money, refreshments, transportation, or advertising connected to the party).

Here, the Evaluation Committee took an abridged approach. It looked at the police report and observed the incident involved two students, *see id.* at 152:6–7, at an apartment off campus, *see id.* at 151:9–10, 156:3–5. *See also id.* at 160:10–11 (explaining the Committee determines location from the complaint). After seeing these two pieces of information, the Committee did not

"go any further." *Id.* at 160:10–11. Instead, it "immediate[ly]" transferred, *id.* at 151:12, the police report to the Office of Student Conduct "for further detail," *id.* at 160:12.

**B**

Once transferred to the Office of Student Conduct, Assistant Director of Student Conduct Michaela Arthur took over the investigation. *See generally* Pl.'s Resp., Ex. J, ECF No. 186-7.

On September 7th, Arthur sent Roe and Doe No Contact Orders. *See* Def.'s Mem., Ex. G at 2, 4, ECF No. 171-5. Arthur also charged Doe with violating Student Code of Rights & Responsibilities Provisions 5.2.2.1 and 5.2.2.4. *See id.* at 12. Provision 5.2.2.1 prohibits "[p]hysical or emotional/psychological abuse" of another person "whether such conduct occurs on or off University property." *Id.* Provision 5.2.2.4 prohibits "[r]elationship violence." *Id.*

Arthur then met with Doe and Roe several times over the next six weeks. On September 13th, Arthur met with Doe to discuss his charges. *See* Hearing Packet at 4–5. He quibbled with a few details of the night. *See, e.g.*, *id.* at 6 (suggesting Roe's bit lip was consensual). He also emphasized "everyone was drinking" at the party. *Id.* at 4.

On September 15th, Arthur met with Roe to hear her perspective. *See id.* at 5. During their meeting, Roe stated "she and [Doe] had both had drinks." *Id.* Six days later, Roe clarified she "had 2–3 seltzers before the [f]ootball game" and "two shots of Yeager back to back" at the party. *Id.* at 7. She stated she saw Doe with a "beer in his hand" and "drink directly from the bottle of Yeager for 20–30 seconds." *Id.* However, "based on his behavior," Roe suggested Doe "drank more." *Id.*

On September 23rd, Arthur met with Doe again. *See id.* During their meeting, Doe refused to say how much he drank and whether he saw Roe drinking "due to his legal process." *Id.* Doe then asked whether Marshall University's investigation could be postponed until after his criminal

case. *See id.* Arthur stated she would ask, but if Doe refused to cooperate, Marshall University would "go on the evidence [it] [is] able to collect and testimony [it] gather[s]." *Id.*

On October 7th, Arthur met with Doe a third time. *See id.* This time, Doe asked questions about the No Contact Order and the investigation process. *See id.*

On October 20th, Doe accepted responsibility for violating Provisions 5.2.2.1 (physical/emotional abuse), 5.2.2.4 (relationship violence), and 5.2.4.3 (underage drinking). *See* Def.'s Mem., Ex. G at 15. Doe agreed to be placed on probation, to participate in an alcohol education course, and to complete twenty hours of community service. *See id.* at 15–16.

The same day, Arthur charged Roe with violating Provision 5.2.4.3 prohibiting "underage consumption of alcohol." Def.'s Mem., Ex. G at 7. As justification, Arthur explained Roe "admitted to drinking underage during the incident." *Id.* She also told Roe that she could request a hearing with an advisor or accept a "voluntary resolution." *See id.* at 8. Under a voluntary resolution, Roe would accept probation, participate in an alcohol education course, and complete ten hours of community service. *See id.*

On October 24th, Roe accepted the voluntary resolution. *See id.* at 11.

### III

Roe sued. She alleges two Title IX causes of action. In Count I, Roe alleges Marshall University's response to her sexual harassment was deliberately indifferent. *See* Am. Compl. ¶¶ 62–76, ECF No. 34. In Count II, Roe alleges Marshall University unlawfully retaliated against her for reporting sexual harassment by punishing her for underage drinking. *See id.* ¶¶ 77–88.

### STANDARD OF REVIEW

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Variety Stores,*

*Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if a "reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

In its analysis, the Court does not resolve disputed facts, weigh the evidence, or make determinations of credibility. *See Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986). Instead, the Court draws all permissible inferences from the facts in the light most favorable to the nonmoving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Still, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## ANALYSIS

Title IX provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

"Discrimination" is interpreted "broadly." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2003). It includes sexual harassment. *See Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 74–75 (1992). As a result, a university's deliberate indifference to known acts of student-on-student sexual harassment is actionable under Title IX. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644–45 (1999). So is a university's retaliation against a student for reporting sexual harassment. *See Jackson*, 544 U.S. at 173–74.

Roe alleges both. *See* Am. Compl. ¶¶ 62–76 (deliberate indifference); *id.* ¶¶ 77–88 (retaliation). The Court considers each in turn. Ultimately, neither claim succeeds.

## I

The Court begins with Roe's deliberate indifference claim. Sexual harassment is an "all too common aspect of the educational experience." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998). Recognizing this tragedy, the Supreme Court has held a recipient of Title IX funds can be held liable for its deliberate indifference to known acts of student-on-student harassment. *See Davis*, 526 U.S. at 44–45.

To succeed on a deliberate indifference claim, Roe must prove six things. *First*, Roe attended an educational institution receiving federal funds. *See Feminist Majority Found. v. Hurley*, 686 F.3d 674, 686 (4th Cir. 2018) (citing *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc)). *Second*, Marshall University had "substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645. *See also Hurley*, 686 F.3d at 686–69 (characterizing this prong as a "basis for imputing liability" to the university). *Third*, the sexual harassment was so "severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect." *Davis*, 526 U.S. at 652. *Fourth*, a Marshall University official with "authority to address the alleged discrimination and to institute corrective measures . . . ha[d] actual knowledge of [the] discrimination." *Gebser*, 524 U.S. at 290. *Fifth*, Marshall University acted with "deliberate indifference" to the harassment. *Davis*, 526 U.S. at 633. *Finally*, the deliberate indifference caused Roe to "undergo harassment" or make her "liable or vulnerable to it." *Id.* at 645.

Roe cannot prove the second and fifth elements. She cannot show Marshall University had substantial control over the private off-campus apartment where the sexual harassment took place. Even if she could, she cannot show Marshall University acted with deliberate indifference.

## A

Start with the text of Title IX: No person in the United States shall be subject to "discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Because the sexual harassment (*i.e.* "discrimination") must occur "under" an "education program or activity," the harassment "must take place in a context subject to the [university's] control"—*i.e.* an "operation" of the university. *Davis*, 526 U.S. at 644–45 (explaining how the "plain language" of Title IX "confines the scope of prohibited conduct"); 20 U.S.C. § 1687(2)(A) (defining "program or activity" as "all of the operations" of a university).

Accordingly, the Supreme Court "cabins" Title IX liability for deliberate indifference to "circumstances" where the university "exercises substantial control over the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645. These are two distinct inquiries. *See id.* at 646–47 (looking first at control over context, then control over harasser); *Hurley*, 911 F.3d at 687–89 (same). A plaintiff must prove both. *See Davis*, 526 U.S. at 645.[3]

## 1

Marshall University had substantial control over the harasser (*i.e.* Doe). Its Student Code of Rights & Responsibilities allowed it to punish Doe for his off-campus sexual harassment and underage drinking. *See* Def.'s Mem., Ex. I at 7, ECF No. 165-9 (Provision 5.2.2.1: punishing off-campus physical and emotional abuse); *id.* (Provision 5.2.2.4: punishing off-campus relationship violence); *id.* at 10 (Provision 5.2.4.2: punishing "[u]nauthorized" possession of alcohol). This is

---

[3] Title IX's implementing regulations track this reading. They define "education program or activity" to include "locations, events, or circumstances over which the [university] exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution." 34 C.F.R. § 106.44(a). If the alleged conduct did not occur in an "education program or activity," the university's Title IX office "must dismiss the formal complaint . . . for purposes of sexual harassment under [T]itle IX." *Id.* § 106.45(b)(3)(i). "[S]uch a dismissal does not preclude action" through another university office or another "provision of the [university's] code of conduct." *Id.*

enough to show substantial control over the harasser. *See Davis*, 526 U.S. at 647 (looking for evidence the harasser is "under the school's disciplinary authority"); *Hurley*, 911 F.3d at 688 (finding substantial control over harassers where university "had ability to punish" them).

**2**

Marshall University did *not* have substantial control over the context of the harassment. When sexual harassment occurs off-campus, the Court must find "some nexus between the out-of-school conduct and the school." *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1115, 1121 n.1 (10th Cir. 2008). Location is not dispositive. *See, e.g.*, *Roe v. Marshall Univ. Bd. of Governors*, 668 F. Supp. 3d 461, 465 (S.D. W. Va. 2023) (warning against taking a "myopic focus on the location of the incident"). Rather, "all the circumstances" of a case are relevant. *Brown v. Arizona*, 82 F.4th 863, 878 (9th Cir. 2023) (en banc). *See also Root v. Univ. of Utah*, 2023 WL 2346315, at *5 (D. Utah Mar. 3, 2023) (looking at who "owns or regulates the physical location, sponsors the event, or hosts or facilitates the program or activity").

A university's control over a "context" can manifest in different ways. There are close cases. This is not one of them. A few examples show way. In *Brown v. Arizona*, student-athlete Orlando Bradford assaulted his girlfriend and a fellow student in an off-campus house during his sophomore year. *See* 82 F.4th at 866. Reviewing "all the circumstances," the Ninth Circuit held the university had substantial control over the context of the harassment. *Id.* at 878. To start, the university subjected Bradford—as a student-athlete—to "increased supervision" through rules "specific to football players." *Id.* For instance, freshman athletes could only live in dormitories and could not inflict violence on women. *See id.* Bradford flouted both rules during his freshman year. *See id.* He often stayed off-campus. *See id.* And he assaulted two students in dormitories. *See id.* at 866. When the university issued a no-contact order between the victim and Bradford, *see id.*

-9-

at 878, Bradford "moved off campus entirely," *id.* at 879. During his sophomore year, coaches gave Bradford permission to live in a private off-campus house—a privilege "conditioned on good behavior." *Id.* at 878 (explaining even "innocuous" behavior meant returning to campus).

Considering these facts, the Ninth Circuit held the "very existence" of Bradford's off-campus living situation was "subject to the coaches' control." *Id.* at 878. Their "heightened level of control and disciplinary power" over Bradford "strengthened the connection between Bradford's off-campus housing and the University's football program." *Id.* A players' living situation depended on the coaches; it was an outgrowth of the football program. *See id.* at 878–79. Had coaches forced Bradford back to campus, the assaults might not have occurred. *See id.* at 879.

In *Feminist Majority Foundation v. Hurley*, university students posted anonymous messages on Yik Yak that disparaged, harassed, and threatened the plaintiffs. *See* 911 F.3d at 680–82. The Fourth Circuit found the university had substantial control over the context of the harassment because the plaintiffs—at least at the motion to dismiss stage—alleged the harassing posts "actually transpired on campus" by using the university's wireless network and by referencing "events occurring on campus." *Id.* at 687.

In *Simpson v. University of Colorado Boulder*, two female undergraduate students were assaulted by members of a university football team and high school students being recruited for the team in an off-campus apartment. *See* 500 F.3d 1170, 1172–73 (10th Cir. 2007). Although the assaults took place off-campus, the university recruited high-school players to campus each year promising "a good time"—including having sex with female campus tour guides. *Id.* at 1173, 1180. Despite being told about previous assaults, the football program failed to adequately supervise or guide players or recruits on- or off-campus. *See id.* at 1184.

The Tenth Circuit found substantial control. The Court explained the assaults were "not simply misconduct that happened to occur [at the university] among its students." *Id.* at 1174. Instead, the "assaults arose out of an official school program." *Id.* By facilitating the presence of both the perpetrators and victims of sexual violence at the off-campus apartment and consciously minimizing oversight of the site, the university rendered the risk of harm "obvious." *Id.* at 1173.

In *Weckhorst v. Kansas State University*, a male student assaulted a female plaintiff in his vehicle and again in his off-campus fraternity house. *See* 241 F. Supp. 3d 1154 (D. Kan. 2017), *aff'd sub nom. Farmer v. Kansas State Univ.*, 918 F.3d 1094 (10th Cir. 2019). Reviewing a motion to dismiss, the District Court allowed the student's claim to proceed. *See id.* 1170. The District Court emphasized the plaintiff alleged the fraternity was a university-sponsored and regulated-student organization, supervised by faculty, overseen by the Office of Greek Affairs, and subject to the university's special fraternity party and event rules. *See id.* at 1170.

Finally, in *Roe ex rel. Callahan v. Gustine Unified School District*, male students repeatedly teased and harassed another male student during a school-sponsored summer football camp. 678 F. Supp. 2d 1008, 1013–14 (E.D. Cal. 2009). Although the football camp was at a different high school than the plaintiff's, the District Court still found the plaintiff's high school had substantial over the context of the harassment because the plaintiff's school sponsored, promoted, and supervised the football camp. *See id.* at 1025.

These cases are cut from the same cloth. In each, an element of school sanction, sponsorship, or connection to a school function tied the context of the harassment to the respondent school. *See Brown*, 92 F.4th at 878 (university's permission created the "very existence" of the site of the assault); *Hurley*, 911 F.3d at 687 (harassment originated on or near campus, used the university's wireless network, and concerned events on campus); *Simpson*, 500 F.3d at 1173

(assaults occurred during a university football team recruiting program); *Weckhorst*, 241 F. Supp. 3d at 1170 (assault happened at a house owned by a university sponsored- and regulated-organization); *Roe*, 678 F. Supp. 2d at 1025 (assault occurred at a school-sponsored football camp). Finding potential Title IX liability in these cases, therefore, made sense. Doing so held the schools responsible for their "own official decision[s]." *Gebser*, 524 U.S. at 291.

Here, the harassment occurred at a private party at a private residence off-campus. Neither Marshall University nor its student organizations owned, controlled, or leased the residence. *See* Def.'s Mem., Ex. C ¶¶ 5–6, 8–10. Instead, the residence was owned by a private citizen for private concerns. *See* Jane Doe Dep. at 47:7–23. Similarly, Marshall University did not host, sanction, sponsor, or affiliate with the party. *See* Def.'s Mem., Ex. C ¶¶ 12–13. No student, faculty member, or other member of the university sought permission to host the party. *See id.* ¶ 12. In short, Marshall University did not know about the party or its location before the incident. *See id.* ¶ 15.

Considering this record, nothing suggests Marshall University controlled—let alone substantially controlled—the context of the harassment. Unlike *Brown*, the "very existence" of the party or apartment was not "subject to" Marshall University's permission. 82 F.4th at 878. Unlike *Hurley*, the harassment did not "actually transpire[] on campus," did not use university resources, or concern university events or students. 911 F.3d at 687. *See* Jane Doe Dep. at 34:14–15 (stating the party transformed from a football watch party to a general nighttime party by the time Roe arrived). Unlike *Simpson*, the harassment did not occur during a Marshall University recruiting program. *See* 500 F.3d at 1174. Unlike *Weckhorst*, there is no evidence the residence or the party was supervised by faculty, subject to specific university rules, or overseen by the Marshall University Office of Student Affairs. *See* 241 F. Supp. 3d at 1170. Unlike *Roe*, there is no hint university officials sponsored or managed the party. *See* 678 F. Supp. 2d at 1025.

Case 3:22-cv-00532    Document 203    Filed 06/24/24    Page 13 of 25 PageID #: 3344

All told, the September 3rd party at 359 Marion Court took place in a "random off-campus apartment" with no connection to the university. *Roe*, 668 F. Supp. 3d at 465 (quotation omitted).

**i**

Roe disagrees. She cites *Owens v. Louisiana State University*, 2023 WL 8880380 (M.D. La. Dec. 22, 2023), and *S.C. v. Metropolitan Gov't of Nashville & Davidson County, Tennessee*, 579 F. Supp. 3d 999 (M.D. Tenn. 2022), for support. Neither case moves the needle.

In *Owens*, a male student assaulted a female student during a party at an off-campus apartment. *See* 2023 WL 8880380, at *10. The female student sued the university. At summary judgment, only a "policy-based heightened risk" claim remained. *Id.* at *3, *5 (alleging the university's orchestrated "culture of silence" around Title IX complaints placed the plaintiff at a "heightened risk" of sexual assault). One element of this claim requires a plaintiff to show the sexual misconduct occurred in a "context subject to the school's control." *Id.* at *5. In reviewing this element, the District Court held there is no bright line rule excluding off campus assaults from Title IX's protection. *See* 2023 WL 8880380, at *10. This Court agrees. *See* Part I.A.2 (citing approvingly cases where Title IX extended to off campus locations).

The problem for Roe, however, is how the District Court reached its conclusion. It relied on the university's use of its Student Code of Conduct to punish off-campus behavior to find substantial control over the context of harassment at an off-campus private apartment. *See* 2023 WL 8880380 at *10. The District Court acknowledged the Fifth Circuit had yet to provide "clear guidance" on whether "sexual assault that occurs off campus can satisfy the control element." *Id.* at *11. To fill this void, the District Court relied on caselaw suggesting off-campus assaults are actionable if the university was "aware of prior assaults by the *same* student-attacker." *Id.* & n.116.

*Owens* may capture the law in the Fifth Circuit. It does not, however, capture the law in the Fourth Circuit. In *Hurley*, the Fourth Circuit first considered control over the context of the harassment, then control over the harasser. *See* 911 F.3d at 687–88. *See also Davis*, 526 U.S. at 646 (same). Whether a university can punish a student for off-campus behavior goes to the latter inquiry—not the former. *See Hurley*, 911 F.3d at 688; *Davis*, 526 U.S. at 647.

Moreover, *Owens* relied on caselaw where the student-attacker previously attacked other students. *See* 2023 WL 880380, at *11. Here, there is no record evidence suggesting Marshall University knew Doe previously assaulted other students. The Court is, therefore, hesitant to rely on those types of cases to resolve the substantial control question presented here.

*S.C.* is also unhelpful. There, a male high school student assaulted a female student on school property. *See* 579 F. Supp. 3d at 1005. The male student videorecorded the assault. *See id.* He then disseminated the video among students and online. *See id.* Students then harassed the female student. *See id.* at 1018–19. Eventually, the school suspended the female student for three days. *See id.* at 1027. The school also asked her to attend other schools in the area. *See id.* During and after her suspension, the female student continued to be harassed by other students. *See id.* at 1029. Eventually, she enrolled at a different school, *see id.*, and sued her former school for deliberate indifference, *see id.* at 1034–35 (dubbing this her "after" assault Title IX claim).

Like *Owens*, the District Court recognized the Supreme Court has never held that the "on-campus/off-campus distinction" presents a categorical bar to Title IX liability. *Id.* at 1034. (stressing schools "typically" do not "have substantial control over students' off-campus actions"). Rather, the District Court—like this Court—looked to see if there was a "sufficient nexus between the out-of-school conduct and the school." *Id.* (quoting *Rost*, 511 F.3d at 1122 n.1). It found a "number of facts" suggesting a nexus.   *Id.* Some of S.C.'s harassment related to an incident that

occurred on campus. *See id.* In addition, some of her harassment "appear[ed] to have been directed, at least in part, at preventing S.C.'s cooperation in the school's own disciplinary investigation related to the in-school incident." *Id.* at 1034. Indeed, the school suspended the female student to "intimidate" her, to "interfere directly" in their own disciplinary investigations, and to squash the incident. *Id.* at 1035. None of these facts are present here.

\* \* \*

In sum, the Court holds that Marshall University does not have substantial control over the context of the harassment in this case to justify extending Title IX liability. *See Roe v. St. Louis Univ.*, 746 F. 3d 874, 883 (8th Cir. 2014) (finding no Title IX liability where assault occurred "during a private party in an off campus apartment"); *Ostrander v. Duggan*, 341 F.3d 745, 750–51 (8th Cir. 2003) (finding no Title IX liability where assault occurred at a private residence that was not owned by the fraternity or the university).

## B

Even if Roe proved Marshall University had substantial control over the context of the harassment, she cannot prove Marshall University was deliberately indifferent in its response.

Deliberate indifference is a "high bar." *Gonzales v. Marshall Univ. Bd. of Governors*, 2019 WL 3432533, at \*3 (S.D. W. Va. July 30, 2019). It requires showing the university's response is "clearly unreasonable in light of the known circumstances." *Davis*, 648 U.S. at 648. In an appropriate case, the Court can resolve this question at summary judgment. *See id.* at 648–49.

Here, the incident occurred on September 3, 2022. *See* Hearing Packet at 5. Within four days, Marshall University's Title IX office reviewed the Huntington Police Department's police report, decided it had no jurisdiction over the incident, and transferred the incident to the Office of Student Conduct. *See* Debra Hart Dep. at 151:9–160:12 (discussing review process).

-15-

The Court finds no error in this decision. At the time of the incident, Title IX's implementing regulations provided: if the sexual harassment "did not occur in the [university's] education program or activity," the university "must dismiss the formal complaint . . . for purposes of sexual harassment under [T]itle IX." 34 C.F.R. § 106.45(b)(3)(i). Roe may want Marshall University to conduct more thorough jurisdictional investigations before transferring cases from its Title IX office to its Office of Student Conduct. *See* Debra Hart Dep. at 151–153 (questioning why the Evaluation Committee's decision was so quick). Even so, sometimes jurisdictional questions—like the one presented in this case—are easy to answer. *See infra* Part I.A.

Once in the Office of Student Conduct, Marshall University immediately issued no-contact orders to Doe and Roe. *See* Def.'s Mem., Ex. G at 2, 4. It then launched a six-week investigation involving multiple interviews of both the respondent and victim. *See id.*, Ex. F at 4–5 (first Doe meeting); *id.* at 5 (first Roe meeting); *id.* (second Roe meeting); *id.* (second Doe meeting); *id.* (third Doe meeting); *id.*, Ex. G at 15 (third Doe meeting); *id.* at 11 (third Roe meeting).

Ultimately, Marshall University first punished Doe for physical/emotional abuse, relationship violence, and underage drinking. *See id.* at 15. It then punished Roe for underage drinking. *See id.* at 7. As justification, it explained Roe "admitted to drinking underage during the incident." *Id.* Admittedly, Doe's punishment is only slightly more punitive than Roe's punishment. But at the time, Marshall University knew Doe faced potential criminal penalties under West Virginia law for his behavior during the incident. *See* Hearing Packet at 8 (referencing Doe's criminal prosecution). Regardless, Marshall University has "a great deal of flexibility" in disciplining its students. *Davis*, 526 U.S. at 648. Courts must refrain from "second-guessing" disciplinary decisions. *Id. See also Hurley*, 911 F.3d at 686 (explaining universities are not "normally liable for failing to cede to a harassment victim's specific remedial demands").

All told, the Court finds Marshall University did not conduct a half-hearted investigation or take clearly unreasonable remedial action. *See Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 263–64 (4th Cir. 2021). As a result, Roe's claim for deliberate indifference fails. *See id.*

**1**

Roe pushes back. She makes two arguments. Neither persuades. *First*, Roe stresses a Title IX department's failure to conduct "any" investigation into a complaint is clearly unreasonable. *See* Pl.'s Resp. at 13. Fair enough. *See Davis*, 526 U.S. at 654 (holding school's decision to make "no effort whatsoever either to investigate or to put an end to the harassment" states a claim for deliberate indifference under Title IX). Yet, the harassment at issue here did not occur in an "education program or activity" under Title IX. *See supra* Part I.A. As a result, Marshall University's Title IX office correctly transferred the incident to the Office of Student Conduct. *See supra* Part I.B (discussing 34 C.F.R. § 106.45(b)(3)(i)'s mandatory dismissal language).[4]

*Second*, Roe argues Marshall University deprived her of rights she was entitled to under university policy and federal law. *See* Pl.'s Resp. at 13. She argues she should have received: (1) an automatic assignment of a university provided advisor, (2) the right to receive supportive measures including counseling and academic accommodations, (3) the right to receive information

---

[4] *Karasek v. Regents of University of California*, 500 F. Supp. 3d 967 (N.D. Cal. 2020), is inapposite. There, the Court held a jury could infer a university maintained a *de facto* policy of deliberate indifference toward sexual harassment by marshaling proper Title IX complaints about sexual harassment away from Title IX into an "informal process." *Id.* at 984–85. At first, this case is appealing. It offers a similar theory as Roe. *See infra* Part II. A closer read, however, shows cracks. *Kasarek* involved three plaintiffs. *See id.* at 971–72. The Court allowed only one student to proceed. *See id.* at 971–72, 993 (alleging an assault on a biannual trip Cal Berkeley Democrats Club trip). The Court dismissed one student because the university had "no control" over the private facility in Alaska where the misconduct took place. *See id.* at 982–83. The Court dismissed another student's claims because the assault took place in a private apartment and not "in the context of a 'specific program.'" *Id.* at 972, 990–91. Although the university's "systematic failures" contributed to the dismissed students' assaults, this "conclusory, high-level assertion," failed to connect the university's deliberate indifference to "what happened to [the dismissed students] in particular." *Id.* at 991. Roe has the same problem. Even assuming Marshall University improperly funneled Title IX investigations into its Office of Student Conduct's less rigid disciplinary procedures, Roe fails to show how the results of her specific non-Title IX incident stemmed from this "chronic mismanagement." Pl.'s Resp. at 15 (quotation omitted). *See also infra* Part II.

about and to participate in proceedings against her attacker, (4) the right to a hearing prior to the imposition of sanctions, and (5) the right to appeal the university's actions against Doe. *See id.*

Not so. For starters, Roe does not cite any law requiring these rights be afforded parties in a non-Title IX investigation. *See id.* Assuming Title IX plays some role, Roe forgets she received a no-contact order—a critical Title IX "supportive measure" used by universities to prevent future sexual harassment. *See* 34 C.F.R. § 106.30(a) (defining term); *Doe v. Marshall Univ. Bd. of Governors*, 683 F. Supp. 3d 522, 532 (S.D. W. Va. 2023) (recognizing some no-contact orders can be "so onerous and one-sided" they make it difficult to schedule and complete classes).

Moreover, Marshall University Title IX's office did not have jurisdiction over the incident. *See infra* Part I.A. It'd be strange to require the Office of Student Conduct—a non-Title IX office— to treat non-Title IX incidents just like Title IX incidents. Doing encourages students to use Title IX to "make particular remedial demands" of a non-Title IX office—what *Davis* prevents. 526 U.S. at 648. Indeed, Title IX is not the "exclusive mechanism for addressing gender discrimination in schools." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) (allowing § 1983 suits based on the Equal Protection Clause); 34 C.F.R. § 106.45(b)(3)(i) (encouraging universities to take action under non-Title IX university policies). *Cf. Gebser*, 524 U.S. at 292 (explaining school's failure to follow a Title IX regulations "does not itself" violate Title IX).

When Marshall University charged Roe, it explained her charge and its justification. *See* Def.'s Mem., Ex. G at 7. It informed Roe of her right to an Advisor during "any stage of the proceedings" and her right to a hearing should sanctions be imposed. *Id.* at 8. It explained she could obtain a copy of her student conduct file. *See id.* It also referred her to Marshall University's Student Rights & Responsibilities and the Student Disciplinary Procedures for more information. *See id.* Knowing all this, Roe accepted a voluntary resolution of her charges. Collectively, sharing

-18-

this information constitutes a reasonable response by a non-Title IX office to a non-Title IX incident. *See Doe v. Bd. of Visitors of Va. Mil. Inst.*, 494 F. Supp. 3d 363, 378 (W.D. Va. 2020) ("Although it was not a Title IX investigation, [the institution's] actions constituted a reasonable response, carried out in a manner that resulted in disciplinary action").

\* \* \*

The Court **GRANTS** summary judgment to Marshall University on Count I.

## II

The Court next considers Roe's retaliation claim. Title IX "encompasses claims of retaliation." *Jackson*, 544 U.S. at 167. Without this protection, "individuals who witness discrimination would likely not report it, indifference claims would be short circuited, and the underlying discrimination would go unremedied." *Id.* at 180–81.

Despite their importance, the Supreme Court has not clarified the elements of retaliation claims. *See Hurley*, 911 F.3d at 694. Until it does, the Fourth Circuit requires Roe to prove: (1) she engaged in protected activity under Title IX; (2) the university took adverse action against her; and (3) there is a causal connection between the protected activity and the adverse action. *See id. See also Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021) (requiring "but-for" causation); Pl.'s Resp. at 21 (conceding "but for" causation).

Assuming—without deciding—"truthfully reporting her sexual assault" to a non-Title IX investigation is protected Title IX activity, Am. Compl. ¶ 83, and the university punished Roe, she still comes up short. Roe fails to provide sufficient evidence suggesting Marshall University punished Roe "because of" her protected activity. *Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 173 (4th Cir. 2023) (stating the "crux" of "retaliation" is "the plaintiff engaged in activity protected by law, and then, because of this, the defendant took an adverse [] action against [her]").

-19-

To show causation, Roe has two options. She must either provide sufficient direct and indirect evidence of retaliation *or* proceed under the *McDonnell Douglas* burden-shifting framework. *See id.* at 173–74 (quotation omitted). Roe fails under either approach.

**A**

Roe cites no direct evidence. *See Bandy v. City of Salem, Va.*, 59 F.4th 705, 711 (4th Cir. 2023) (defining direct evidence as "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested [disciplinary] decision") (quoting *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006)).

Instead, she cites indirect evidence. She argues but for her report to Arthur, Marshall University would never have learned about the incident or Roe's underage drinking—let alone punished Roe for violating the Student Code of Rights & Responsibilities. *See* Pl.'s Resp. at 21.

Roe is wrong on both fronts. *First*, Marshall University learned about the incident from the Huntington Police Department—not Roe. *See* Def.'s Mem., Ex. G at 2 (describing police report); Debra Hart Dep. at 151:9–12, 156:3–5 (describing initial review of police report). *Second*, Roe first met Arthur on September 15th. *See* Def.'s Mem., Ex. F at 5. During their meeting, Roe admitted to consuming alcohol at the party. *See id.* But Arthur already knew this. Two days earlier—on September 13th—Arthur met with Doe. *See id.* at 4–5. There, Doe stated "everyone was drinking" at the party—including Roe. *Id.* at 4 ("In his original meeting, [Doe] stated there were about 10 people at the location, and they all were drinking."). Marshall University, therefore, had independent knowledge of Roe's underage drinking.

Without more, Roe has no evidence suggesting she would have escaped punishment had she kept silent. In fact, had she stayed mum, Marshall University would still make its disciplinary

-20-

decision "on the evidence [it] [is] able to collect and testimony [it] gather[s]." Hearing Packet at 7. This would mean crediting Doe's testimony of Roe drinking underage at the party. *See id.*

**B**

This leaves the *McDonnell Douglas* burdens-shifting framework. Under this framework, Roe must first make a *prima facie* case of retaliation—*i.e.*, she engaged in a protected activity and was retaliated against because of it. *See Lashley*, 66 F.4th at 174. If she does, Marshall University can then cite legitimate, nonretaliatory reasons for its actions. *See id.* If it does, Roe must show the proffered reason is pretext. *See id.* Critically, Roe "always bears the ultimate burden of persuading the trier of fact that she was the victim of retaliation." *Id.* (quotation omitted).

Assuming—without deciding—Roe sets out a *prima facie* case of retaliation, *see id.* (allowing courts to jump ahead to pretext where appropriate), the burden shifts to Marshall University. As Roe concedes, Marshall University offers a legitimate, nonretaliatory reason for punishing Roe: she violated Student Code of Rights & Responsibilities Provision 5.2.4.3 prohibiting underage drinking. *See* Def.'s Mem., Ex. G at 7; Pl.'s Resp. at 21 (conceding this).

With the ball in her court, Roe must show Marshall University's proffered reason is pretextual. She cites three pieces of evidence. None persuade. *First*, Roe emphasized Arthur did not punish other students at the party who drank alcohol underage. *See id.* at 21. True enough. But when Arthur asked Doe and Roe to identify other students, both parties refused to give names. *See* Def.'s Reply, Ex. B at 186:4–14, ECF No. 193. Arthur cannot punish nameless individuals.

*Second*, Roe emphasizes Arthur did not punish Doe for prior incidents of harassment even though Roe told Arthur that Doe "put his hands on her in the past and she was scared of him." Pl.'s Resp. at 21–22 (quotation omitted). Again, true. But when Arthur asked Roe to expand on her allegations of prior harassment, she did not share more information. *See* Def.'s Reply, Ex. A ¶ 7.

Without more testimony from Roe, Arthur could not punish Doe for these prior alleged infractions. *See* Def.'s Mem., Ex. J at 15 (requiring a "preponderance of the evidence" to issue sanctions).

 *Finally*, Roe suggests Marshall University punished her in a larger "effort[] to put out a legal and PR inferno." Pl.'s Resp. at 23. She starts her tale in November 2022. *See id.* at 2. On November 4, 2022, this Court entered a preliminary injunction halting Marshall University's Title IX disciplinary proceedings due to "procedural improprieties." *Id.* (discussing *Doe v. Marshall Univ. Bd. of Governors*, Civ. Act. No. 3:22-cv-346 (S.D. W. Va. Nov. 4, 2022)). On November 16, 2022, USA Today published an article lambasting Marshall University's Title IX office. *See id.* at 2–3 & n.1. Student protests erupted. *See id.* at 3. In response, Marshall University President Brad Smith launched a new student-led Title IX task force. *Id.* at 3. At some point, Marshall University fired Title IX Director Debra Hart. *See id.* at 3–4. Eventually, Marshall University's Title IX office adopted an "amnesty policy" where victims who admit to alcohol usage during a sexual harassment incident will not be punished for their infraction. *See id.* at 5. The Student Code of Conduct office, however, still pursues sanctions whenever a student admits to violating the Student Code of Rights & Responsibilities. *See* Pl.'s Resp., Ex. I at 37:6–44:14, ECF No. 186-6.

 None of this evidence suggests retaliation in *this* case. To start, on October 24, 2022—the date of the adverse action—Marshall University's explained its decision to punish Roe: she consumed alcohol while underage in violation of Student Code of Rights & Responsibilities Provision 5.2.4.3. Since then, the record "lacks any sign of deviating from [this] explanation." *Lashley*, 66 F.4th at 177. This "straight and consistent line of explanation" is more persuasive than Roe's evidence "which wanders, here, there, and yonder." *Id.*

 Moreover, all of Roe's evidence of retaliation comes *after* Marshall University completed its investigation in October 2022. The Court is hesitant to read much into this generalized evidence

-22-

unmoored from her particular situation. "[G]eneralized evidence, standing alone, cannot satisfy a Title IX plaintiff's summary judgment burden." *Doe v. Univ. of Denver*, 1 F.4th 822, 831 (10th Cir. 2021). Rather, a plaintiff must connect her generalized evidence with particularized evidence indicating retaliation in her "particular case." *Id.* Roe does not bridge this gap. At best, she suggests Marshall University manipulated its Title IX system *after* Roe's decision to accept a voluntary resolution. Remember—the underlying incident here was *not* a Title IX issue. *See infra* Part I.A. It was an Office of Student Conduct issue. *See id.* Roe's evidence does not address how Marshall University shaped its treatment of non-Title IX investigations before or during Roe's investigation.

The deficiencies in Roe's generalized evidence are "best elucidated" by highlighting cases where courts did credit generalized evidence. *Doe v. Va. Polytechnic Inst.*, 2022 WL 334501, at *9 (W.D. Va. Aug. 11, 2022), *aff'd* 77 F.4th 231 (4th Cir. 2023). In *Doe v. Baum*, the Sixth Circuit credited evidence showing a university was under an active investigation by the U.S. Department of Education while the plaintiff's disciplinary hearing was pending. *See* 903 F.3d 575, 586 (6th Cir. 2018). In *Doe v. University of Arkansas-Fayetteville*, the Eighth Circuit credited evidence showing the university was facing a similar DOE investigation, state legislature investigation, and an active, highly publicized lawsuit by a female athlete while the plaintiff's disciplinary hearing was pending. *See* 974 F.3d 858, 865 (8th Cir. 2020). And in *Doe v. Purdue University*, the Seventh Circuit credited evidence showing the DOE opened two investigations against the university while it considered the plaintiff's case. *See* 928 F.3d 652, 656, 668 (7th Cir. 2019). In each of these cases, the credited evidence occurred before or while the plaintiff's disciplinary hearing was pending. As such, the credited evidence helped show how "pressure on the university" to crack down on pending Title IX investigations "was far from abstract." *Purdue University*, 928 F.3d at 668.

Roe's evidence is different. She details events that took place after Roe accepted a voluntary resolution to her underage drinking charges. *See* Pl.'s Resp. at 2–6 (summarizing evidence). She asks this Court to *first* infer Marshall University acquired a motive to stymy complaints in its Title IX program after her punishment and to *second* transplant this retaliatory motive backwards into her own case about a non-Title IX investigation.

The Court declines to do so. *Cf. Imungi v. Va. Commonwealth Univ.*, 2023 WL 3570925, at *10 (E.D. Va. May 19, 2023) (expressing skepticism at a retaliation claim where evidence of retaliation arose in spring 2020, but the adverse action itself occurred in fall 2019). As Plaintiff's counsel admits: their evidence "come[s] too late for Roe." Pl.'s Resp. at 3.[5]

* * *

Roe admitted to underage drinking—a violation of the Marshall University Student Code of Rights & Responsibilities. There is no evidence suggesting Marshall University punished Roe for reporting her sexual harassment. *See Garrett v. Univ. of S. Fla. Bd. of Trs.*, 824 F. App'x 959, 966–67 (11th Cir. 2020) (rejecting at Title IX retaliation claim where student covertly recorded a conversation she had with Title IX coordinator and her advocate in violation of Florida law and the university's Student Code of Conduct); *Doe v. Gwinnett Cnty. Sch. Dist.*, 2021 WL 4531082, at *17 (N.D. Ga. Sept. 1, 2021) (explaining "the fact that Defendant punished her *after* she reported it does not necessarily mean that it punished her *because* of it.").

---

[5] Roe curiously stresses that, prior to 2020, Marshall University's Title IX office investigated off-campus incidents if both the complainant and the respondent were Marshall University students. *See* Pl.'s Resp. at 4 (citation omitted). In 2020, things "suddenly" changed. *Id.* Around then, Marshall University started to transfer off-campus incidents not part of an official, university-sponsored program from its Title IX office into its Office of Student Conduct. *See id.* (citation omitted). Roe sees this shift in policy as evidence of retaliation. The Court is not convinced. On August 24, 2020, the U.S. Department of Education modified pre-existing Title IX regulations. *See* 34 C.F.R. § 106.45. These new regulations required Title IX offices to dismiss complaints about harassment occurring outside a university's education program or activity. *See id.* § 106.45(b)(3)(i); *infra* Part I.A. Although not Title IX issues, a university still could respond to the underlying incidents through other university policies or procedures. *See* 34 C.F.R. § 106.45(b)(3)(i). Marshall University's "sudden" change of heart tracks—in real time—its regulatory obligations.

-24-

Accordingly, the Court **GRANTS** Marshall University summary judgment on Count II.

**CONCLUSION**

The Court **GRANTS** Defendant Marshall University Board of Governors' Motion for Summary Judgment. The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        June 24, 2024

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE